Welcome to the Fourth Circuit. For a moment there that when I saw, I think those are law clerks in the back holding laptops in unison, I thought there was some kind of protest going on. I'm glad that that's not the case. Um, we have two cases this morning for argument 23-4302 United States versus Murillo-Lopez, uh, Ms. Bryant, whenever you're ready. Good morning, your honors. And may it please the court, Ariel Bryant on behalf of the appellant, Mr. Murillo-Lopez. We'd like to discuss two issues addressed in our briefs before the court this morning. Information that officers learn after a stop, search, and seizure cannot operate as a post hoc substitute for meeting law enforcement's burden. That burden being to point to reasonable, articulable facts. The government failed to meet its burden here because meeting a general resemblance of the cruise warrant, being present in the general vicinity and traveling with other Hispanic men does not establish reasonable, articulable suspicion. It's not really the general vicinity. It's one of, uh, specifically number of enumerated properties, right? It's not, it's not the same block, right? Well, respectfully, no, your honor. There were several residences under review and detective or deputy Alley never gave a specific number as to how many were under review. However, we know there to be a few. It's not a city block though. It's not three city blocks. You said the general, the general vicinity to me conveys like four city blocks. It's not that right? That's correct, your honor. But the government failed to meet its burden for a separate reason as well. Can I ask you a question? You said residences, were these apartments, were these homes? What do we know about that? We don't know that from the record, your honor, but looking at a Google map, it appears to be duplexes. But the government failed to meet its burden for a separate reason. There was not substantial evidence as to Mr. Maria Lopez's knowledge of status. The evidence on this point was mixed and the government points to an uncorroborated statement, which cannot carry the government's burden. For these reasons, we would ask the court to hold the government to its burden and find in Mr. Maria Lopez's favor. Turning to the first point on suppression, there was no reasonable articulable suspicion that warranted an investigatory stop of Mr. Maria Lopez. It is well-established that officers must articulate reasonable, specific facts that cut out a substantial portion of innocent travelers. Here, the facts leading up to the investigatory stop are critical in that regard. As the court is aware, several residences were under review and at those residences, officers happened to locate, according to page JA-25, two individuals who met the general description of the Cruz warrant. That is, Hispanic males with short black hair. However, at that time, officers could not make a positive identification as to whether either of them was Mr. Cruz. Therefore, officers then proceeded to trail the individuals for over 70 minutes in the vehicles. During that time, not even so much as observing a traffic infraction on which to make the stop. They also ran the plates of the vehicle during that time, determining the vehicle was not registered to a Mr. Cruz, but rather to a Mr. Maria Lopez. And there's no reference in the record as to any relationship between these parties. Nonetheless, officers decided to proceed at that point and complete the investigatory stop as reflected on page JA-46 on the, quote, hopes of locating the suspect. This does not establish reasonable articulable suspicion, your honors, where effectively the officers attempted to use a warrant for person A to duck the reasonable articulable suspicion requirement for person B. This was explained and illustrated, your honors, in United States versus Hudson out of the Sixth Circuit. In that case, the officers were looking for a black man who was the subject of a warrant. The officers knew that this individual, based on some information, would be in a particular place with a particular woman in a particular vehicle and at a particular time. Officers proceeded on that information in the attempts to locate this individual. And of course, at that time, they saw the vehicle. They saw that the woman in that vehicle, however, they saw two black men in the vehicle with that woman. Officers did not attempt to make any further positive identification of the individuals, but decided to proceed forward nonetheless. They did locate the individual, but on appeal before the Sixth Circuit, the Sixth Circuit explained that that did not create reasonable articulable suspicion because the officers effectively went off of a subjective hunch. I'm going to ask you a question. Of course, the district court relied on cases in our circuit, and you may disagree with the way the district court interpreted them, but at JA 184 in the district court's order, the district court says that we, the Fourth Circuit, has previously held that descriptions as or even more generic than the one here at can properly contribute to an officer's reasonable articulable suspicion. And it cites for that proposition, our decision in Humbert. What's wrong with that analysis? What's wrong with that analysis, your honor, is one of the cases that the court cited specifically gets into the type of vehicle and the make that was before the court, before the officers at that time, there aren't any specific descriptions beyond Hispanic male with short black hair, few specific residences and traveling with other Hispanic men. What about the fact that there was, I guess, uh, that the officers understood, I think that these were alleged MS 13 members. Does that add anything to the analysis? Respectfully? No, your honor, because as stated in United States versus black by this court, reasonable suspicion by association is insufficient. And that's exactly what's going on here. Your honors effectively law enforcement saw several Hispanic men. They knew they were looking for a suspected MS 13 member. And they believed on that basis alone that Mr. Maria Lopez or the other individuals might've been MS 13, but that was not known at the time, which is the critical analysis. So I don't know about the case you cited from the sixth circuit. This, this officer testified that he had seen a picture of the individual for whom there was a warrant, right? That's correct. Your honor. He said, when I look, I had seen a picture. And then when I looked at the individuals coming out of that, this is at J 114, he said, did, did what you'd seen in the picture eliminate the individuals you'd seen? And he said, no. Right. That's correct. So I don't think we can just say it's Hispanic men with short hair. It's Hispanic men who look sufficiently like the person I saw in a picture and it didn't eliminate him. Right. That's why you don't, you say over and over again, it's literally just Hispanic males with short hair. I don't think that's accurate based on the record. Well, your honor, looking specifically to the photo, the photo did not add anything or move the ball forward for the government. Sure. It does. If I look at a photo, if I look at a photo and then I look at other people, I, a lot of people, I'm going to be like, that's not the person I saw in the photo. That's not the person I saw in the photo. That's not the person I saw in the photo. And here the officer said it did not eliminate him as the person I saw in the  That seems like it moves the needle quite a bit, actually. Respectfully. No, your honor, because the government's burden is to determine if this individual is the one who was. No, no, no. It's the government's burden to determine whether there's specific articulable reason to believe this might be the person, not whether it is the person.  Your honor. But in broad daylight, middle of the day, the officers were looking at the photo and looking at the individuals who came out of the residence, determining two of them might've been the individual, but they took no steps further. It just seems like that eliminates a lot of potentially innocent people. You came out of a building where I had reason to believe the person I was looking for is, I'd seen a photo of the person I was looking for. I look at the guy and I think, I can't say it's not the guy I'm looking for. That eliminates, it strikes me rather shockingly large number of innocent people. It might eliminate several, your honor, but it doesn't. Well, your honor, looking to the census records for Sterling, Virginia, 47% of the demographic is Hispanic. That is to say. You mentioned earlier that they surveilled the cars for 70 minutes. How many times did they stop? And I know there's, there's some discussion, they, in the record as to they weren't sure as to what they were doing, but they were stopping, getting out of the car, getting back in the car. And, um, how, how many exact stops were there? There were two, your honor. I believe at, there was Walmart and Sunoco and they moved between the vehicles as would be fairly standard when going between vehicles and determining which individual you want to ride with to the next stop. But there's nothing in the record as to indicate what those moving between the vehicles meant one way or another. Moving back to the standards here, however, there was also no reasonable articulable suspicion that Mr. Maria Lopez was armed and dangerous. The most express evidence that the court had before it of this was Deputy Alley's testimony. He stated that he himself did not believe Mr. Maria Lopez was armed and dangerous. So why does that matter in terms of the stop? Because they had a warrant, right? And assuming that they were able to narrow the universe of folks and you, you know, you respond to Judge Hyten's questions with demographics regarding statistics of Latinos in the area, but the point is that, and you may, obviously you disagree with this, that, that they believe they had narrowed the universe of potential suspects to a number of residences and they had seen the photos. So anyway, what, what does harmed and dangerous, harmed, what does armed and dangerous have to do with it? Armed and dangerous matters at that point, your honor, because the law located the satchel and the firearm in the satchel. And in terms of the stop, what does that have to do with this? Moves us past the point. So on suppression, there being reasonable articulable suspicion for the stop and then the reasonable articulable suspicion for the search. So the fundamental problem here, the district court found as a factual matter, your client consented to this. And if he consented, none of this matters, right? It's correct, your honor. The lower court found that Mr. Maria Lopez consented. And so before we can even get to the merits, we have to find that finding is clearly erroneous, don't we? We do, your honor. And we believe it is clearly erroneous. Looking to the facts of the stop on the body cam footage, when deputy Allie takes the satchel and opens it, he exclaimed certain expletives in surprise as if he was surprised to see the firearm in the first place, but moving on to the consent aspect for Mr. Maria Lopez, there was a language barrier known again, looking to the body cam footage from the very beginning of this stop. After the very first question that officers ask during the stop, the deputy Allie and the other officers ask for, I need Spanish, meaning that they were looking for an interpreter at that point. They recognized there was a language barrier and they proceeded nonetheless. There was also gesturing, accompanying all the questions that was asked as if that would somehow aid in the comprehension. They also asked questions in English and in Spanish, but critically, all of the consent questions were in English. All this going to show that there was a language barrier from the start and officers proceeded nonetheless. Taking a step to the next issue, your honors, the government also failed to meet its burden as to the sufficiency of the evidence. There was not substantial evidence as to Mr. Maria Lopez's knowledge of status. The government was required to show status that Mr. Maria Lopez was an illegal alien. And then separately, knowledge of status that Mr. Maria Lopez was aware that he was an illegal alien at the time of the stop. And at the time of the possession of the firearm. Can I just, I guess I'm probably inclined to say this isn't waived because the district court didn't cross all its I's and dot all its T's, but you are really lucky the government didn't cross appeal this. Your honor, this issue was not waived. Looking to the facts at the sentencing hearing. Oh, I know, but I think it's unambiguously clear that your client was given a lower sentence by the district court based on the district court's understanding that we weren't going to be here raising this argument now. And now you are. So I think there's a more than plausible argument. The district court would have given your client a higher sentence had the government cross appealed. Well, your honor, looking to the transcripts specifically and the burdens at sentencing versus at trial, any statements that Mr. Maria Lopez made at sentencing would be to a, the court would be finding those facts to a preponderance of the evidence. I'm just saying if I was the district court, I would be extremely angry at you right now, because I would feel like I sentenced this defendant based on a false representation about what was going to come up on appeal and what wasn't. Understood your honor. But looking to the facts, the court was required to question deputy or I apologize, uh, the Mr. Maria Lopez to ensure that any waiver was voluntary. And that is simply not reflected on the facts. I think I probably agree with you about that. Yes, your honor. And if we could point the court specifically to perhaps the most telling statement made on JA 601, when the court is going back and forth with the defendant on status and knowledge of status, the defendant states to the question of, were you here illegally? Well, not in the, I mean, not, well, I didn't really understand that it was a crime to be illegal. I mean, I did not really understand the meaning of the word illegal until they told me the meaning. Again, the government's burden was to show at trial beyond a reasonable doubt that Mr. Maria Lopez knew at the time he possessed the firearm, wasn't the following sufficient. First of all, an officer testified that your client said he knew he was in the country illegally. And then you're going to say that's the uncorroborated test, but it's not uncorroborated because as the district court pointed out, there's no evidence that he entered the country. He's, he's not as far as we know, he's clearly not a natural born us citizen. There's no evidence that he entered the country legally. That is indirect evidence that he knew he entered the country illegally. Um, there's the fact that he expressed concern about handing over certain identification to express no concern about sort of pain. All of that seems like circumstantial evidence of knowledge of illegality. And whether you think it's good enough or not, like it's not just his testimony. There's a whole bunch of other circumstantial evidence that indirectly support could support an inference. He knew who's in the country illegally. Why isn't that obviously enough? It's not enough your honor, because taking a step back on an initial point, Mr. Maria Lopez came over as a minor and it's very routine. Sure, but that evidence is not that strong. Right. Uh, well, as to whether Mr. Maria Lopez knew he was illegal or not, that information on turning over identification or the facts of how he might've come over, do not explain his knowledge of status because as stated by the government previous, as stated in the record, the, uh, information that the government points to is the lack of the a file, the lack of identification, the Salvadoran citizenship, not wanting to give up his father's information for fear of immigration repercussions, but none of that goes to Mr. Maria Lopez's knowledge of status. If the government had wanted to introduce evidence of Mr. Maria Lopez's knowledge of status, it should have followed United States versus Rodriguez Soriano. That is introducing testimony that could corroborate Mr. Maria Lopez's statements. That if taken in the light, most favorable to the government were that he stated he was illegal. All that to show your honors, we ask that the court find in Mr. Maria Lopez's favor and hold the government to its burden. Thank you, your honors. Thank you, Ms. Bryant. Let's hear from the government. Good morning, your honors. And may it please the court, Daniel Honnold for the United States. Um, I think I'll just start where my friend started with the fourth amendment issues. Um, the district court didn't err in denying the motion to suppress here. Uh, first and foremost, the stop that was conducted was a reasonable execution of an undisputedly valid arrest warrant. Um, the officers had taken steps, uh, investigative steps to significantly narrow the scope of who they could permissibly stop that day. Um, I think it matters that they follow them for 70 minutes. They stopped twice getting in and out of the car. He had a picture, um, as to reasonable suspicion. And also the second portion of that is criminal activities afoot. I believe, um, deputy at Allie said that he had no, um, he had no one. He had no idea whether or not they were armed or that he didn't think that he was armed or dangerous. And he did not, um, know of any, see any criminal activity within the 70 minutes that he followed them. No, your honor, the lack of personally observing any criminal activity or indicia of criminal activity during that time span is irrelevant to the propriety of the stop here. There's two different sort of areas of fourth amendment doctrine that I think we need to separate out to fully understand this, the first is the warrantless Terry stop where officers do need reasonable articulable suspicion that criminal activity is afoot or has been completed, um, in order to, or is about to occur, um, in order to conduct a warrantless stop. The other body of law that we need to really be looking at and focused on here is, did the officers have reason to believe that one of the people they were stopping is the individual named in an arrest warrant when you're in that body of case law, which is what we have here, you don't separately and independently need to also see someone, you know, be about to commit a crime in order to lawfully stop them. But does it make a difference that he, they followed them for 70 minutes? No, your honor. Um, there is, they had a picture of Mr. Cruz. They had a picture of Mr. Mr. Cruz. They followed him for 70 minutes. They got in and out of the car. Um, and even when he walks up to him at the gas station, he has the photo of Mr. Cruz. And I believe the testimony is that he knew at that point he was not Mr. Cruz. No, your honor. That's not correct. At that point, he did not know whether or not the driver was or was not Mr. Cruz. Um, and it's completely reasonable for him to think that he doesn't know the person individually, personally. And if you were to look at the arrest photos of Mr. Maria Lopez and Mr. Cruz at JAA 44 and 156 respectively, frankly, they look quite similar to each other. It would be very reasonable for an officer to need to, uh, to want to conduct further investigation to ascertain that person's identity. So it is not the case that either the officer testified, uh, that he believed or had reason to believe that the driver was not Cruz. At that point, he still didn't know. And in fact, did not come to learn Mr. Maria Lopez's identity until after the recovery of the firearm. So up until that point, it was still quite plausible that the defendant was Mr. Cruz. He turned out in fact not to be, but that does not affect the propriety of the stop here on this record. Um, I'll just turn back to, you know, in line with the photo, the officers also conducted an investigation to learn the whereabouts of Mr. Cruz, the arrest warrant suspect, um, and took efforts to stake out one of the residences. I'll just point out for the court at JAA 88, I believe, um, Deputy Alley describes that home as a townhouse. There's no evidence that it's occupied by multiple families or anything like that. It's certainly not some large apartment complex where any number of people could be walking in and out. Isn't the testimony that there were multiple properties they were surveilling? So the factual finding is that, um, the officers had obtained information that Mr. Cruz was at one of few addresses on the same block in Sterling, Virginia. Um, there's no testimony or evidence really about the number of potential addresses. There's no evidence, um, that the officers had staked out other addresses around the same time. The only evidence that we have is that the officers were staking out the specific address where they saw Mr. Cruz or saw an individual who they would later come to understand was Mr. Cruz who matched the description of Mr. Cruz come out. Um, but, but all that to say that, uh, again, this is not a large scope or scale of potential suspects. This eliminates the vast travel, the vast majority of travel, the geographic limitation that sort of makes this case different than, because the description itself is fairly generic, right? Your Honor, when it's paired with the photograph, uh, I would disagree. Um, having the photograph that the officers had access to and were able to see, seeing a photograph, it's, you know, a picture is worth a thousand words. It gives a lot more information than simply Hispanic male, short hair. Um, you can see someone's age. You can see their, you know, their, the size of them, many other physical characteristics that are going to be above and beyond the description that was also presented here. Um, it seems to me that some of those cases that say the description is insufficient are literally like someone calls in a person of a certain race, sometimes like a vague description of their clothing, sometimes a vague description of their height. Correct. And those are the cases that we say like that, that doesn't eliminate like a lot of people.  Your Honor. But here we have, uh, uh, you know, several really significant things that the officers are doing before they make contact to help to narrow the scope of potential people who could be stopped. Um, unless the court has further questions on that, I'll turn to the frisk. Um, as the court noted, uh, with my friend, I think the easiest, you know, path here is probably on the consent front. Um, the only dispute that is raised here on appeal is whether or not the defendant had enough English language understanding to be able to validly consent. Uh, there's no other challenge to the validity of the consent here. And that finding, uh, was subject to a clear factual finding by the district court that the defendant did in fact understand enough English to be able to consent here. It's really hard to show clear error. It's, it's, there's nothing in this record that's going to really demonstrate that the defendant did not understand enough English based on the conversation that he had with Deputy Alley and what's visible on the body wearing cam to... What about the, in the beginning, he asked, when he first approaches the car, he asked one question and then he turns around and say, basically, Hey, I need an interpreter over here. Um, is that, is that not sufficient? No, Your Honor. That's not sufficient. Uh, two things. Uh, the Deputy Alley had had a significant interaction with the defendant before Detective Fields, who is the person who's got the body camera on him, um, approaches. So there's a significant portion that's been asked about and was subject to cross-examination at which, um, Deputy Alley testifies the defendant had not even a little bit of trouble understanding him in English. Um, then Detective Fields, as you were mentioning, approaches with the body wearing camera. It's Detective Fields who says, I need some Spanish. He says it in kind of a joking way. They both kind of laugh about it. Um, it's clear that... What about the hand gestures? He's asking him if he's going fishing. I mean, it's, it's clearly a, some language barrier going on there. Um, between the, the deputy and, and, um, Mr. Lopez. So I don't think it's fair to, um, characterize it as a language barrier. And of course, Deputy Alley is making that gesture about going fishing after the defendant had responded to him in English, fishing. Um, he, he didn't say that he wasn't using that gesture to help the defendant answer. He was merely repeating back to him what the defendant had told him in English. Um, so no, there's not going to be enough here for, to show, you know, a clear error of, of factual finding as to his level of language acquisition. And there's no, um, case law that I'm aware of that says, you know, a minor language barrier is going to be enough to show clear error. There's no case law that says that the person has to be a native or completely fluent English speaker in order to be able to validly consent. He just needs to understand enough. Um, and that's what we have here. Um, so that's going to cover both, of course, the, uh, pat down and the search, which isn't separately challenged. Um, if this court were to disagree, we could still move to the merits of the preliminary frisk. Uh, of course there is reasonable articulable suspicion to believe that, uh, the defendant was presently armed and dangerous at the time of the pat down. Um, the officers have all the information that they have about, uh, the suspect that we've mentioned before, plus the appearance of the satchel, which is sagging forward with a significant amount of weight, uh, which caused the officer at JA 119 to believe that the defendant was presently armed. It's an objective analysis. Uh, all of these arguments about what deputy Allie may or may not have believed are simply not going to be relevant for this court's analysis. I thought at, um, and I'm looking at JA 100, um, 118, that Allie testified that there was nothing in his interaction that made him think that he was armed and  So we need to put that statement in a bit more context, Your Honor. Um, deputy Allie testified that at some point in the interaction, he came to subjectively believe for some period of time because of the defendant's demeanor and rapport that they had, that he may not have been armed. Um, but the real question for us, the real analysis that we have to do is at the time of the contested action, which is the pat down, did the officer have reasonable articulable suspicion? So there's two things here. One, his subjective impressions are irrelevant to that legal question. But even if the court were to consider them, if you look on JA 119, the question is very, very clearly asked and answered at the time of the pat down, did you think he was armed? Yes, I did. Um, so whatever deputy Allie may have thought at one point in the interaction, that's not, you know, both legally and factually, that's not going to bear on, on the ultimate outcome here. Um, I didn't hear my friend address the second amendment challenge. So I'm happy to rest on the briefs on that unless the court has any questions about that. Um, our view is that of course that it's waived for having been untimely filed and the defendant can't show plain error, but I will not spend any time on that unless the court has any questions. I realized we've said waiver in that context doesn't seem pretty obviously forfeiture or not waiver. Your honor, it is been repeatedly waiver over and over again. I know, but we say things are waived when we really mean forfeited all the time. Just kind of like we say things are jurisdictional that are clearly not jurisdictional. Your honor, I think some of that confusion has been cleared up in recent years. I mean, Ojedoke and I think was from 2020. This court in Sanders, I think just a month ago, uh, re-invoked waiver by citing rule 12. But conceptually, how would that possibly be waiver? Like that's, it seems like it's the definition of forfeiture, the failure to make a timely claim of a known right. That's literally the definition of forfeiture. I understand that your honor, but it's, uh, this court's case law that says that. Um, and also I think there's, you know, fairness, a fairness rationale behind that as well. Um, for two different reasons, is this a known right? Yes. It's rule 12. You know, that as a defendant that you have the ability and the obligation in a timely manner. The same is true when I don't raise a Miranda objection or when I don't raise a fourth amendment. Like there's like a gazillion objections like that. Well, your honor, um, uh, the failure to raise a motion to suppress is going to be a waiver on appeal as well. Um, when I don't object to hearsay at trial. Well, that's different, your honor, because, um, that's not subject to rule 12 and there's no good cause sort of exception built into that. So maybe I'm missing something here, but why does that matter to you? Waiver forfeiture, you still win. We're happy to win either way the court wants. Um, I just, the court sometimes that's, that's our problem. That's not yours. It's, it's a good problem for the government to have at this point. Um, this is more of an informational question. Anything else? Do you think you could have cross appealed this sentence in response to this appeal? That seems at least at minimum, very inconsistent with representations that were made to the district court judge. I think the remedy, I think the remedy that we're seeking here, I know I, well, you didn't cross appeal. So I think it's, I think this is purely a, could you have, could I, I haven't thought about it, your honor. I, and I don't know the answer. I'm sorry. Um, I think we would be seeking to disturb the judgment. So I think it would have to be subject to a cross appeal if we wanted, if we wanted to get a resentencing based on these representations or misrepresentations at the district court level. Okay. So let me go, let me go to the end of the question that you think that this is forfeited or waived or whatever. During the plea, for example, so the hypothesis is, I think there's no question, the defendant did not personally say the most critical thing. The argument you have is that his, the lawyer said the most critical thing. And I get, generally speaking, lawyers can agree to all kinds of things for their clients, but I actually think this might be one of those that they can't because, so for example, you agree that during a, you couldn't, during a plea colloquy, rely on defense counsel to say, my client is knowingly involuntarily doing this, right? That's the kind of thing that has to come out of the defendant's mouth personally. Right? Yes, your honor. But I'll remind the court that those require that, that dynamic is subject to rule 11. Um, here we've got sort of, and that's, you know, in the context of someone waiving their rights to trial, their rights to cross-examine witnesses, their entire right to appeal everything. This is the waiver of a single discreet issue, which I think is fairly uncontroversial. It's a waiver of an issue of whether I'm guilty of one of the crimes I'm charged with, right? Yes, your honor. But that's true of, of many challenges, right? I mean, we wouldn't be raising challenges unless they would affect either the sentence or... This isn't like I raised this challenge, which results in the exclusion of evidence, which results in me being acquitted. This is me admitting to guilt of a crime, right? This starts to sound a lot more like rule 11 to me. Well, you're, so it's not rule 11. I know it's, I know it's not technically rule 11, but it. And I'll just, you know, I don't think there's any legal distinction in the, in the doctrine, in the case law for the proposition that it has to be the defendant personally that waives the issue in this particular context and not in the myriad other contexts.  Um, well, it seems quite a thing to say that a lawyer can essentially admit their clients factually. So your honor, the waiver is not to the admission of factual guilt. The waiver is the, is of the ability to raise this particular sufficiency challenge on appeal. That's what's being waived. So that's kind of a different thing. Um, it's like an appeal waiver or it's like, uh, when, uh, defense attorney, as often happens, will, um, withdraw an objection to, for example, a sentencing enhancement. Um, at sentencing, there's no, you know, real rule 11 colloquy that's happening there. There's no, it can dramatically increase. Exactly. Your honor. They have, these things can have large consequences for defendants. Defense attorneys are the agents of their, uh, clients and they are able to waive issues, um, even if they're not being specifically pressed personally, the defendant on whatever that waiver is. And I'll just remind the court. If the court were to look at JA 587 through 604, the defendant is intimately involved in this entire colloquy, even if he doesn't answer the ultimate question and his lawyer answers it for him, he's being questioned back and forth with the judge. They take a 10 minute recess for him to discuss with his counsel, the consequences of this very issue. And then he comes back. The judge said, this is really, really important to me. And I want to give you a chance to talk to your lawyer about it. Right. So, I mean, I think the record is quite clear that the court gave a really significant opportunity for the defendant to personally, to knowingly understand what he was giving up by doing this. Um, and of course at the end, um, he's, the district court is telling defense counsel and defendant's presence, you're not going to be appealing this issue. Defense attorney says, I understand. He doesn't say anything. He doesn't express any surprise or any disagreement with that notion or says, no, wait, I'd rather not get acceptance of responsibility so I can preserve this issue on appeal. Um, I think just taking as, as your honor was mentioning earlier from the district court's perspective, I mean, how would a district court feel if they were to read this opening brief after the colloquy that he had with his defendant, I think this is, you know, sort of the ultimate example of taking inconsistent issues, taking inconsistent positions on issues below and on appeal. And that this court should not be able, or should not countenance that. Well, let's assume for the sake of argument, we've reached the merits. Would you just tick through what you think are the two? So I think we have cases that say like his word alone cannot be the sole evidence. What do you think are like the two or three best corroborating things in the record that could permit a reasonable fact finder to find that he knew he was in the country illegally? Yes, your honor. Um, I'd say officer Perotti's investigation, um, the review of the relevant government databases. We're trying to prove a negative. He's not a citizen. So if the court were to look at GA 319, I think officer Perotti has a really good summary of his investigation. He says, I've looked at all the databases. I've reviewed all the things I've interviewed the defendant. There is nothing in my investigation that's turned up either the possibility of citizenship in the United States or any lawful status or presence to be here. Um, and that's indirect, but that's indirect evidence of what he knows, right? Like the fact that you're, the fact that as far as we can tell, you're not in the country legally is itself indirect evidence that, you know, yes, your honor. I, and I found this to be a really interesting point. I think we can take some guidance from Greer here. Um, in Greer, you know, the person who's a felon usually knows they're a felon, right? And someone who's crossed the border illegally has remained here illegally over the course of several years, has never had any viable claim of confusion or actual, um, you know, right to be here. They're going to know that fact about themselves. And a jury is fully entitled to, um, make that reasonable inference. I guess our position when you frame it that way is even if you were to take out all the defendant's statements, there would have been sufficient circumstantial evidence of the defendant's knowledge. You tack on the fact that he tells, um, deputy Allie, I'm not a citizen. I'm illegal. Um, that's a JA 261 to 262. Um, it's hard to know what better evidence you could possibly want for someone's knowledge for them, for them to say, I am, I have that status. I am illegal. He knows that fact about himself. So it's not correct to say that, uh, this case was premised entirely on an uncorroborated confession. It's not even dependent on that confession necessarily. There's sufficient evidence without it. There's excellent evidence with it. If the court has no further questions, we'd ask that you affirm. Thank you, counsel. Ms. Eickhoff. Your honors, may it please the court. Ashley Eickhoff on behalf of the appellant, Mr. Maria Lopez. I'd like to first return to what the court was just talking about with the government and the government misrepresented the elements of the offense here. The government has to prove status and also knowledge of illegal status. The government did not present sufficient evidence as to knowledge and the record site that the government just gave you at JA 262, that interview with officer Parity was after the stop. The government has the burden to prove that he had knowledge of his illegal status at the time that he possessed the gun. The fact that he knew that he was illegal afterwards does not prove anything as to status. How far after the stop? Was, uh, the testimony with officer Parity. Years or like a day? I don't know that off the top of my head, your honor, but it was. Can't a jury find that if you knew it, when you spoke to an officer shortly after, you probably knew it before you were arrested too? No, your honor, because that directly, it directly contradicts Rodriguez which says that you, this court cannot find that any statements of the defendant uncorroborated can, uh, represent the corpus delicti of the offense. I agree with that. It can't be the only evidence, but it certainly doesn't have to be none of the evidence either. Right. But all of the evidence presented, virtually every defendant who confesses guilt is confessing knowledge of something that happened in the past. Right? Like when I say I killed my friend last week, what I'm actually saying is today, I remember killing my friend last week. That doesn't prove that I intentionally, but it's pretty, the fact that I remember it today is pretty powerful evidence that I knew it then, right? All of the evidence the government presented goes to status, not his actual knowledge. No, him saying, I know I'm in the country illegally goes directly to knowledge. I agree that can't be this. I agree that can't be the sole evidence, but I don't agree with you that it's not any evidence. It, it, it can't be used as the sole evidence, your honor. So turning, what about the government's point that this sort of the Greer point, a jury is entitled to find that just like a person who's a felon normally knows they're a felon, a person who's in the country illegally normally knows they're in the country illegally. I think with a felon, the standard is much different, your honor. With illegal aliens, many illegal aliens are brought to this country as children, just like Mr. Maria Lopez was in this case. He was brought to this country by his father, which is shown in the sentencing allocation at JA 601, which Ms. Bryant previously read to you, where he stated that he did not know that he was in this country illegally and did not understand what it meant to be illegal. That's just like many dreamers. That's why we have DACA. Like a lot of criminal defendants. He said, I didn't know. And like a lot of criminal defendants, the jury is entitled to not believe him when he says that, right? The, yes, your honor. Uh, so returning first to the stop itself, we have cited many warrant cases where they're also found that there was no reasonable articulable suspicion, the government seems to think that we should ignore warrantless cases. But even if that's so, we have cited warrant cases. For example, Hudson was a warrant case in this court and this district, um, in the circuit. I mean, Slocum was also a warrant case where even with a warrant, the court still found that there was no reasonable articulable suspicion and they did not have that here. Um, so the government relies heavily on the photograph, uh, as sort of, in the universe of people that might be subject to the stop. What, what's your take on the significance of any of the photograph? Your honor. I'd like to point this court to Jace 89, where deputy Allie testified. Well, we knew the license plate of the blue Ford Explorer, which came back to someone registered Mr. Maria Lopez and the detective whose case the armed robbery was. And he knew the address or the area of addresses were associated to the target. That's about it. There was no testimony into the record that they thought that they knew that he was Mr.  In fact, that they said the opposite. Well, I mean, but the photograph exists, right? And they had the photograph. They may not have focused on it then. I'm asking you what, if anything is, what's, why isn't that significant? At least some additional evidence that a district court could take into consideration in deciding whether or not there was enough to justify the stop here. I would turn you to JA 156, which is a photo comparison between Mr. Cruz and the appellant, Mr. Maria Lopez, which shows that they bear little resemblance to each other. And also deputy Allie testified that he did not know whether Mr. Maria Lopez was Cruz at the time that he approached the car. In fact, he said that he hoped that they would find the subject of the warrant. And that is exactly what this court found insufficient, what the sixth circuit found insufficient in Hudson, which is that the mere hopes of finding a suspect of a warrant is not enough. And for those reasons, your honors, we ask that you find for the appellant, Mr. Maria Lopez. Thank you very much. Ms. Bryant and Ms. Eickhoff, I see from the record that you all took on this case with your law firm, Pro Bono, I want to thank you for ably representing Mr. Murillo Lopez this morning. You did a fine job and Mr. Hono, you did an excellent job as representing the interests of the United States. So I want to thank all the lawyers here this morning. We'll come down and greet you and then move on to our second case.
judges: Albert Diaz, Toby J. Heytens, DeAndrea Gist Benjamin